UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

SAMUEL D. ISALY,

                     Plaintiff,

     -v-

BOSTON GLOBE MEDIA PARTNERS LLP and
DAMIAN GARDE,

                  Defendants.

-------------------------------------------------------------X

*No. 18 Cv. 9620*

**COMPLAINT**

**JURY TRIAL DEMANDED**

## NATURE OF THE CLAIM

1.      This is an action for defamation of character and injury to the personal and professional reputation of Plaintiff Samuel D. Isaly caused by Defendants who either published or wrote an article published on December 5, 2017 in STAT, an online "magazine." The headline and first paragraph of the STAT article immediately and unmistakenly presented its explicitly defamatory characterization of Plaintiff:

### "Biotech hedge fund titan Sam Isaly harassed, demeaned women for years, former employees say"

*"The founder of biotech's largest and most powerful hedge fund has for years perpetuated a toxic culture of sexual harassment, former employees told STAT, routinely subjecting young female assistants to pornography in the work place, lewd jokes, and pervasive sexist comments."*

2.      From its clickbait headline to its tabloid-like opening, the STAT article makes it clear that its purpose is to strip Plaintiff of his well-deserved, hard-earned reputation as a highly regarded, successful pioneer and investor in the biotech industry, who accomplished that despite severe physical disabilities, and replace it with a sinister

and damaging portrait of a serial sexual harasser of the women who work with him in the business he founded and built with his partners. It has already resulted in massive damage to Plaintiff's professional life, business interests, and status in the business he founded, the field of biotech investment, and to his investments in that sector, and caused extreme emotional distress, humiliation and disruption of his personal life and relationships.

3.      As this Complaint will demonstrate, the defamatory accusations of the STAT article are false. Plaintiff comes to this Court to obtain the remediation that an action for defamation provides under the laws of the United States and New York: vindication of his hard-won, excellent personal and professional reputation, and an award of compensatory and punitive damages to alleviate the injuries inflicted by Defendants.

## THE PARTIES

### Plaintiff

4.      Plaintiff Samuel D. Isaly is a resident of New York City. He is the founder of OrbiMed Advisors, LLC ("OrbiMed") and, until recently, was its Managing Director. His outstanding professional reputation as an analyst of and investor/advisor in biotech companies is such that he has been widely admired by his peers. Publication of the false and defamatory STAT article has changed all that, severely damaging his standing in that community and in his personal life.

5.      Mr. Isaly's life story is a remarkable one of triumph over adversity. In his teens, while competing as a member of his high school's wrestling team, he suffered an injury which confined him to a wheelchair for the rest of his life. His condition, known medically as quadriplegia, imposes severe, immobilizing limitations on the use of his

arms, legs, hands and fingers which require him to have the assistance of a personal aide

to carry out the physical movements involved in his daily activities, known as "the

activities of daily living" ("ADL") in the medical and physical therapy communities.

With respect to his professional life, as will be shown subsequently, these physical

limitations demonstrate that the false and defamatory actions attributed to him in 2009-

2010 in the STAT article, particularly those in the statements of his former assistant,

Delilah Burke, were physically impossible in that period, and remain so today.

**Defendants**

6.      Boston Globe Media Partners LLC ("BGMP") is a limited liability

corporation incorporated under the laws of Massachusetts.  It is a subsidiary of Globe

Newspaper Company, Inc., a privately held company also incorporated under

Massachusetts law.  It publishes content on a number of websites concerning niche

subjects; pertinent to this Complaint, BGMP publishes STAT, an online news website

covering the fields of health, medicine, life sciences, and biotech news.  STAT's business

headquarters are in Boston, Massachusetts and it maintains news bureaus around the

United States.  On information and belief, BGMP and STAT reporters regularly transact

business in New York by reporting operations in the State, as well as communicate with

New York-based individuals and organizations to obtain information for use in their

publications.  Defendant Garde, BGMP's employee, did so in preparing his article about

Plaintiff.  The STAT article at the heart of this case was targeted specifically at Plaintiff,

a resident of New York City, and OrbiMed, headquartered in New York City, and was

datelined from "NEW YORK."

7.     Damian Garde is a reporter for BGMP's STAT online news service covering the medical, healthcare and biotech fields, and is the author of the article which defamed Plaintiff.  He resides in Boston, Massachusetts.  Garde conducts his reporting activities in various locations, including New York where he conducted interviews of Plaintiff and some of his business associates at OrbiMed's New York City office on December 4, 2017.  On information and belief, in his reporting for the article, Garde regularly visited, communicated into, and sought information for his article from persons in New York, such as Delilah Burke and other former OrbiMed employees who reside in New York.

## JURISDICTION AND VENUE

8.     This case is within this Court's jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  Venue is proper in this district under 28 U.S.C. §1391(b)(2).  The matter in controversy in the cause of action exceeds $75,000.00.

## THE STAT ARTICLE

9.     The entire STAT article (the "Article") is attached as Exhibit A.  Taken as a whole, from its headline to its closing word, it is a false and defamatory per se publication of and concerning Plaintiff, his alleged actions, and the "toxic culture" he allegedly "perpetuated" at OrbiMed.  With its eye-catching, startling headline and lead paragraph, the Article attracted widespread attention from individuals working in, investing in, or simply interested in the medical, health and biotech sector of U.S. and international commerce.  The Article remains on BGMP's STAT website to this day, continuing to inflict reputational damage, emotional distress and financial loss on Plaintiff.

-4-

10.    Besides its opening paragraph (quoted in paragraph 1), the paragraphs

which follow are also individually false and defamatory per se:

    a.   Five people who once worked at investing giant OrbiMed Advisors
       said Sam Isaly, the firm's 72-year-old managing partner, kept a set of
       breast implants on his desk, palpating them like stress balls during idle
       conversation. He wantonly demeaned and verbally abused female
       employees, they said.

    b.   One woman said on several occasions, she glimpsed hardcore
       pornography playing on the large screens that dominated the trading
       room floor of the $15 billion fund.

    c.   Four women said they repeatedly complained about Isaly's behavior to
       senior executives at OrbiMed, getting sympathy, but no action.
       Though their jobs paid well and came with many perks, the boorish
       environment eventually drove each to quit, the women said.

    d.   "I'm scarred," Delilah Burke, who was Isaly's assistant for about 18
       months beginning in 2009, said in an interview with STAT. "I still
       have anxiety from that job — now, years later."

    e.   And the assistants, young and replaceable compared with investment
       professionals, said they felt they had no recourse as Isaly routinely
       sexualized the workplace and harassed them, seeming to delight in
       their resulting discomfort.

    f.   Burke, now 37, said her first jarring experience at OrbiMed came
       within months of starting. Leaving her desk and entering the firm's
       hectic trading floor, she found that one of the big-screen monitors had
       been switched away from financial news and was instead playing
       hardcore pornography, she said, an apparent prank to the dozen male
       traders doing their work below it.

       "At first I was like, 'Oh, the trading room is just insane,'" she said. But
       things quickly escalated.

       Two days after this incident, Burke said Isaly called her into his office
       under the pretense of needing an important document. When she came
       around his desk, one of his monitors was playing a pornographic
       video, she said, and he beamed at her stunned reaction.

    g.   Dismayed, she began chronicling Isaly's behavior by sending notes to
       herself on her personal email account.  In 10 of those

contemporaneous emails, shared with STAT, she recounts in terse shorthand indignities including "hooker joke" and "dirty pic."

Isaly would embed pornographic images or videos in seemingly innocent emails on an almost daily basis, she said. Then he'd laugh at her revulsion upon discovering them, she said.

h.  He would sprinkle his to-do lists for her with dirty jokes and cryptic setups that would expose Burke to something lewd on the internet, she said. For example, on April 15, 2010, his daily list of tasks included "look up 'kit kat shuffle,'" Burke said. She ignored the command, knowing from experience where it would likely lead. Had she followed Isaly's instructions, she would have found that the phrase is a euphemism for masturbation.

i.  For Burke, the final indignity came on Aug. 12, 2010. She said Isaly called her into his office and asked her to retrieve a file from his briefcase. When she opened it, she found a flesh-colored vibrator sitting atop his effects, she said. The next sound was Isaly's booming laughter from across the office, she said.

"The vibrator thing is when I quit," Burke said. "It was just, 'You're disgusting. I'm leaving. This is it.'"

j.  A former investment professional at OrbiMed said Isaly's behavior — and its effects on women in the workplace — were widely known among the firm's leaders.

"People knew that Sam definitely crossed the line," he said. "There was a lot of cringing, even at the partner level, but not much got done about it."

k.  "No ethical person would work there for more than a few years," Burke said. "You make your money, and then you leave."

11.    Delilah Burke served as an executive assistant to Plaintiff at OrbiMed in parts of 2009 and 2010. Her duties included performing many physical movements that Plaintiff was unable to perform himself, including operating communications devices, such as a computer keyboard and mouse, telephones and other workplace mechanisms. Pertinent to this case, and as recounted above, Burke was an identified "source" for the most significant and substantial false and defamatory statements about Plaintiff, allegedly

-6-

based on her personal experiences. As alleged herein, her statements published in STAT are false, having no basis in her actual experience working with and assisting Plaintiff to function as the Managing Partner of OrbiMed. Her statements are also the basis for Defendants' publication that Plaintiff "created" a "toxic atmosphere" of sexual harassment in the OrbiMed office that has persisted to this day.

12.     Each of the Article's statements reproduced above is false and defames Plaintiff. In combination, and in the context of the headline, the statements and their implications created in the minds of reasonable readers a shocking and demeaning characterization of a man who, until that publication, was a revered and respected figure in the field of investing, particularly in biotech, and admired for his successful efforts to overcome physical disabilities he has suffered from since high school.

13.     Those disabilities, from 2009 to the current day, make it impossible for him to have taken the actions alleged in the Article. They were not part of his ADL. In short, Plaintiff, in 2009 and 2010, was physically unable to perform the actions attributed to him in that period by his then assistant, Burke. Even more pertinent is the fact that Burke was the person whose job it was to operate his office computer keyboard and mouse to display financial data or conduct internet searches, or use other communications devices. Whatever imagery appeared on his personal computer monitor, or the two Bloomberg financial service monitors in Plaintiff's office, was the result of Burke's operation of their controls, not Plaintiff's. Plaintiff did not have the ability to "embed pornographic images or videos" in his emails, which Burke prepared, or "sprinkle his to-

do lists" for her with dirty jokes and cryptic "set ups" involving "lewd" content on the

internet, or to have "routinely sexualized the [OrbiMed] workplace" by such actions.

14.     Plaintiff's physical incapacities involve all of his extremities (hands,

fingers, arms, feet, and legs).  His condition in 2009-2010 and up to the present required

extensive medical and therapeutic treatment to improve the functioning of his shoulders

and limbs in his ADL.  These treatments were necessary to give him the strength to

enable what little movement he could achieve when necessary to transfer out of his

wheelchair.  During her employment, Burke was thoroughly familiar with Plaintiff's

physical condition, both by her own observation and because she made the appointments

with doctors and therapists for Plaintiff as part of her duties.  The Article's allegation

about the "final indignity" allegedly imposed on Burke by Plaintiff:  a "flesh colored

vibrator" (the alleged sex toy) sitting atop files in his briefcase, never happened.  Plaintiff

has never had such a device in his office or anywhere else.  Burke's decision to quit her

job is thoroughly documented in interoffice emails in which she admitted that her

decision to quit was motivated by the heavy demands of the job and elements of her

personal life; other emails, written by Burke before and after her departure, accurately

describe her relationship with Plaintiff in grateful and endearing terms.

## THE CAUSES OF ACTION

15.     Plaintiff repeats and realleges paragraphs 1-14 above.

16.     By their publication on December 5, 2017 of the Article, Defendants

falsely stated to readers of BGMP's STAT website in New York and around the world

that Plaintiff persistently engaged in sexual misconduct involving words and actions and

related workplace harassment of female employees of OrbiMed from at least 2009 to

2017. These allegations and their implications published by Defendants about Plaintiff's actions and moral character are false and defamatory and implicate Plaintiff in serious workplace misconduct that is violative of both state and federal law.

17. These false allegations disrupted and damaged Plaintiff's relationships with his colleagues in OrbiMed and negatively impacted his personal financial interests in OrbiMed. They have also caused severe emotional and physical distress to Plaintiff as he sees the investment management business he founded and built with his colleagues, tarred with the brush of false allegations of workplace abuse and harassment of women which, in today's #MeToo culture, produces instant ignominy, humiliation, and irreparable injury.

18. A further source of emotional distress and humiliation for Plaintiff is having to witness the distress caused by such allegations among family members and friends even though they know they are false and inconsistent with the character of the person they know and love.

19. Defendants BGMP and Garde published the false and defamatory Article, as alleged above, with a level of fault involving negligence, gross irresponsibility or a reckless disregard for whether the allegations made by their sources were true or false. Defendants' republication of Burke's false allegations were made with reckless disregard of whether they were true or false, marked by the failure of BGMP's, Garde's and STAT's editors to check Burke's credibility and motivation for making her devastating accusations.

20. Defendant Garde, acting for an on behalf of BGMP, personally observed Plaintiff's physical limitations during their meeting in New York for an interview on December 4, 2017: Plaintiff, upon greeting Garde, was not able to shake hands in the conventional manner, and invited Garde to "slap" (as in a "high five") his upright but inert right hand fingers with Garde's own hand, clearly showing Plaintiff's inability to grasp with his fingers. At no time during that lengthy interview did Plaintiff demonstrate the fine hand and finger dexterity he would need to operate a computer keyboard or mouse to access internet pornography, put it on his office or trading room monitors, or "embed" harassing content in emails.

21. More important, at no time during the interview, did Garde inquire about how the severely disabled quadriplegic he was interviewing was able to "[play] a pornographic video" on "one of his monitors" "[w]hen [Burke] came to his desk," which "became her first jarring experience at OrbiMed. . . within months of [her] starting." Nor did Garde inquire whether Plaintiff's office was equipped in any way to control what was being displayed on "the big-screen monitors" on "the firm's hectic trading floor," let alone whether Plaintiff could operate any such controls or whether such monitors could be used to show pornography. If Garde had done an internet search on Plaintiff and his career prior to the December 4th interview he would have found extensive media reporting which noted Plaintiff's severe physical limitations as a quadriplegic, which should have led him to inquire about the physical movements necessarily involved in Burke's allegations about actions he took in his offices while she was employed there.

22.     Garde's failure to inquire into Plaintiff's ability to perform such actions is even more remarkable for another reason. Three years to the day before that interview, while employed at another online publisher on biotech subjects, Garde wrote an article headlined "Barrier Breaking Drug May Lead to Spinal Cord Injury Treatments."[1] The article discussed the paralyzing effects of spinal cord injuries and discussed a potential breakthrough treatment in development by academic researchers.  Garde clearly was not, three years later, unaware of the catastrophic disabilities involved in quadriplegia resulting from spinal cord injuries such as Plaintiff's.  In light of this knowledge, his failure to inquire about Plaintiff's ability to take the actions Burke charged him with, suggests a desire to avoid learning that Plaintiff could *not* do these things, or why he needed an assistant like Burke herself to perform them. Garde's avoidance of information which could contradict the allegations of his principal source is also demonstrated by his further failure to accept Plaintiff's offer, late in the interview, to arrange a meeting with Plaintiff's physiatrist, the medical doctor intimately familiar with his medical history of quadriplegia and the limitations imposed on Plaintiff in 2009-10 to the present day.  In these circumstances, Garde's failure to inquire about any aspect of Plaintiff's ability to perform any of the actions attributed to him by Burke gives rise to an inference of conscious avoidance of the truth about her allegations or, at a minimum, that he failed to act with due consideration for standards of information gathering ordinarily followed by responsible journalists.

---

[1]  Available at:  https://www.fiercebiotech.com/biotech/barrier-breaking-drug-may-lead-to-spinal-cord-injury-treatements.

23.    Plaintiff has been severely damaged by Defendants' actions alleged above which have had destructive effects on Plaintiff's personal and professional reputation, his emotional and psychological well-being, and his business relationships and investments in the biotech sector.  He respectfully requests remediation in the form of monetary damages and injunctive relief.

WHEREFORE, Plaintiff Samuel D. Isaly demands judgment against Defendants Boston Globe Media Partners LLP and Damian Garde, jointly and severally:

(a)    for compensatory damages in an amount exceeding the jurisdictional limits of this Court, but not less than Five Million Dollars ($5,000,000), to be determined at trial, together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

(b)    for punitive damages, to be determined at trial, but not less than Fifteen Million Dollars ($15,000,000);

(c)    for injunctive relief requiring Defendant BGMP to remove the Article, and any related comments or editorializing subsequently added, from the STAT website and any other internet locations within BGMP's control where they may be found; and

(d)    for such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a

trial by jury.


Dated:   New York, New York
         October 19, 2018


                                     CARTER LEDYARD & MILBURN LLP


                             By:     _____
                                     Alan S. Lewis
                                     John J. Walsh
                                     2 Wall Street
                                     New York, NY  10005
                                     Telephone:  212-732-3200

                                     *Attorneys for Plaintiff*