UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

SAMUEL D. ISALY,

       Plaintiff,

  -v-                                                     No.  18 CV 9620-LTS-GWG

BOSTON GLOBE MEDIA PARTNERS LLC,

       Defendant.

--------------------------------------------------------x

<u>MEMORANDUM ORDER</u>

Plaintiff Samuel Isaly ("Plaintiff") brings this defamation action against Defendant Boston Globe Media Partners LLC ("Defendant"), asserting that he was defamed by statements in an article published by Defendant in STAT, an online news website, on December 5, 2017.  (Second Amended Complaint ("SAC"), Docket No. 32, at ¶ 1.)  Before the Court is Defendant's motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief can be granted.  (Docket Entry No. 39.)  The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1332.

The Court has reviewed all of the parties' submissions carefully and, for the following reasons, grants Defendant's motion to dismiss the SAC in its entirety.

<u>BACKGROUND</u>

The following is a summary of the material facts as alleged in the SAC, unless otherwise indicated.  Plaintiff's well pleaded factual allegations are assumed true for the

purposes of this motion practice.

Plaintiff is the founder and former Managing Partner of OrbiMed Advisors, LLC ("OrbiMed"), a hedge fund that invests in healthcare and biotechnology companies. (SAC, at ¶ 4.) Plaintiff is quadriplegic due to an athletic injury suffered when he was a teenager. (Id. at ¶ 5.) He has been confined to a wheelchair since the injury, and the use of his extremities is limited. (Id.) While Plaintiff retains limited use of his arms and hands, he requires extensive medical treatment to improve the functioning of his shoulders and other limbs "to enable what little movement he can achieve when necessary to transfer out of his wheelchair or use his arms and hands." (Id. at ¶ 13.) Plaintiff also requires the assistance of a personal aide to engage in many of the physical movements of daily activities, which includes help with operating electronic devices such as the telephone, the computer keyboard, and the computer mouse. (Id. at ¶¶ 5, 10, 12)

Defendant is a Massachusetts limited liability corporation that publishes STAT, an online news website that covers the fields of health, medicine, and biotechnology. (Id. at ¶ 6.) Damian Garde ("Garde") is an employee of Defendant and author of the article at issue in this case (the "Article"). (Id.) Garde sought information for the Article from former OrbiMed employees and interviewed Plaintiff and some of his business associates at OrbiMed's offices. (Id.) On December 5, 2017, STAT published the Article, which was headlined "Biotech hedge fund titan Sam Isaly harassed, demeaned women for years, former employees say." (SAC, Ex. A, (the "Article"), at 2.)[1] The Article reports that five former OrbiMed employees stated that

---

[1] A full copy of the article is attached as Exhibit A to the SAC. (SAC, Ex. A). A copy of such a written instrument that is an exhibit to a pleading is part of the pleading for all purposes, including this motion practice. Fed. R. Civ. P. 8(c); see Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

Plaintiff "has for years perpetuated a toxic culture of sexual harassment . . . routinely subjecting young female assistants to pornography in the workplace, lewd jokes, and pervasive sexist comments." (Id.) The five sources are also reported to have stated that Plaintiff "wantonly demeaned and verbally abused female employees," and that Plaintiff kept a set of breast implants at his desk, "palpating them like stress balls during idle conversation." (Id.)

The Article described four of the sources as women who worked at OrbiMed as executive assistants between 2000 and 2015, and one source as a male investment professional. (Id. at 5.) Delilah Burke ("Burke") is the only source who spoke to STAT on the record. (Id.) Burke served as Plaintiff's executive assistant between 2009 and 2010, a role that required extensive personal interaction with Plaintiff. (SAC, at ¶¶ 10, 13.) In the Article, Burke is cited as the source of a number of allegations concerning specific incidents that directly implicate Plaintiff in workplace misconduct. Burke stated that Plaintiff would "embed pornographic images or videos in seemingly innocent emails on an almost daily basis" and that he would "sprinkle his to-do lists for [Burke] with dirty jokes and cryptic setups that would expose Burke to something lewd on the internet," such as an instruction to look up a term that is a euphemism for masturbation. (SAC, at ¶¶ 9(g)–(h); Article at 6.) Burke also described an incident in which Plaintiff called her into his office to retrieve a document, and "beamed" at her reaction to seeing a pornographic video playing on his computer monitor. (SAC, at ¶ 9(f).) Burke reportedly stated that she quit her job at OrbiMed after an incident in August 2010, in which Plaintiff asked her to retrieve a file from his briefcase, in which she found a "flesh-colored vibrator" on top of Plaintiff's effects, and Plaintiff laughed. (SAC, at ¶ 9(i).) The Article reports that Burke documented some of Plaintiff's actions in contemporaneous emails to herself, and that STAT reviewed at least 10 of these emails to corroborate Burke's statements. (Article, at 6.) The

Article also reports that "[a] person who has heard Burke talk about these incidents over the years confirmed to STAT that she has long been troubled by them." (Id.)

On December 4, 2017, the day before Defendant published the article, Garde conducted a lengthy interview of Plaintiff at OrbiMed's offices in New York. (SAC, at ¶ 6, 24).[2] Three of Plaintiff's colleagues and a professional "crisis-management consultant" joined Plaintiff at the interview. (Article, at 3.) During the interview, Garde asked a number of specific questions about the allegations of misconduct that would eventually appear in the article, all of which Plaintiff denied. (Lewis Decl., Ex. 1, at 15-17.) The published Article included Plaintiff's repeated denials of misconduct, as conveyed at the interview. (Article, at 3, 6, 8.) The Article also included comments from two of OrbiMed's partners that they "had never received complaints about Isaly's behavior" and that some of the allegations, like those involving the breast implants on Plaintiff's desk, amounted to "normal workplace behavior." (Id. at 4.) In addition, the Article reported that "[n]one of the five former employees who spoke with STAT alleged that Isaly touched them physically in a sexual way." (Id. at 3.)

The article noted that an OrbiMed partner emailed STAT before the article was published, stating "[i]f this article proceeds I hope that you will be fair and focus on the person

---

[2]  Plaintiff has provided the Court with a full transcript of the interview. (Declaration of Alan S. Lewis in Support of Opposition to Motion to Dismiss ("Lewis Decl."), Docket Entry No 52, Ex. 1.) Defendant has proffered a complete audio recording. (Declaration of Jonathan M. Albano in Support of Motion to Dismiss, Docket No. 42, Ex. C.) The SAC references the interview in several locations to make factual claims in support Plaintiff's cause of action. (SAC, at ¶ 6, 16, 24–28.) For purposes of this motion, the Court considers the transcript provided by Plaintiff as a document that Plaintiff had knowledge of and relied upon in bringing suit, and thus proper for consideration in connection with evaluation of the sufficiency of the allegations of the SAC. See Brass, 987 F.2d at 150 (holding that district courts may make use of "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" in evaluating Rule 12(b)(6) motions).

responsible, not the entire firm." (Id. at 3.) An updated version of the Article included a statement by OrbiMed, which read "[t]he incidents cited are concerning and OrbiMed has retained the services of an outside independent law firm to investigate the matter. OrbiMed takes gender equality seriously and wishes to encourage a supportive work environment and equal opportunity for all employees." (Id. at 3.)

In the SAC, Plaintiff asserts that all of the allegations of misconduct reported in the Article are false and that Defendant "acted in a grossly irresponsible manner in that Defendant disseminated the defamatory statements without having employed standards of information gathering that a responsible publisher would ordinarily follow before publishing defamatory statements of this nature." (SAC, at ¶ 3.) He alleges that his "physical limitations made it (and continue to make it) physically impossible for him to have committed the acts that the Article falsely accuses him of committing in 2009-2010, particularly factual allegations whose apparent source is his former assistant, Delilah Burke." (SAC, at ¶ 5.) He denies that the acts alleged by Burke were "part of his ADL," and alleges that "Burke was the person whose job it was to operate Plaintiff's computer keyboard and mouse to display financial data, conduct internet searches, or use other communications devices." (SAC, at ¶ 12.) The SAC continues:

> Whatever imagery appeared on [Plaintiff's] personal computer monitor … was the result of Burke's operation of their controls, not Plaintiff's. Plaintiff did not have the ability to 'embed pornographic images or videos' in his emails, which Burke prepared, or 'sprinkle his to-do lists' for her with dirty jokes and cryptic 'set ups' involving 'lewd' content on the internet, or to have 'routinely sexualized the [OrbiMed] workplace' by such actions.

(Id.) Plaintiff alleges that, rather than identifying the alleged vibrator incident as precipitating her resignation from OrbiMed (as the Article reports), Burke informed OrbiMed that "her decision to quit was motivated by what she perceived as the heavy demands of the job as well as circumstances of her personal life." (SAC, at ¶13; see also id. at ¶ 16 (criticizing as irresponsible

Garde's failure to inquire at the interview with Plaintiff as to the circumstances of Burke's departure).)

> Plaintiff asserts that the following statements in the Article are defamatory:
>
> "a. Five people who once worked at investing giant OrbiMed Advisors said Sam Isaly, the firm's 72-year-old managing partner, kept a set of breast implants on his desk, palpating them like stress balls during idle conversation.  He wantonly demeaned and verbally abused female employees, they said.
>
> b. One woman said on several occasions, she glimpsed hardcore pornography playing on the large screens that dominated the trading room floor of the $15 billion fund.
>
> c. Four women said they repeatedly complained about Isaly's behavior to senior executives at OrbiMed, getting sympathy, but no action.  Though their jobs paid well and came with many perks, the boorish environment eventually drove each to quit, the women said.
>
> d. 'I'm scarred,' Delilah Burke, who was Isaly's assistant for about 18 months beginning in 2009, said in an interview with STAT.  'I still have anxiety from that job–now, years later.'
>
> e. And the assistants, young and replaceable compared with investment professionals, said they felt they had no recourse as Isaly routinely sexualized the workplace and harassed them, seeming to delight in their resulting discomfort.
>
> f. Burke, now 37 said her first jarring experience at OrbiMed came within months of starting.  Leaving her desk and entering the firm's hectic trading floor, she found that one of the big-screen monitors had been switched away from financial news and was instead playing hardcore pornography, she said, an apparent prank to the dozen male traders doing their work below it.  'At first I was like, 'Oh, the trading room is just insane,'' she said.  But things quickly escalated.  Two days after this incident, Burke said Isaly called her into his office under the pretense of needing an important document.  When she came around his desk, one of his monitors was playing a pornographic video, she said, and he beamed at her stunned reaction.
>
> g. Dismayed, she began chronicling Isaly's behavior by sending notes to herself on her personal email account.  In 10 of those contemporaneous emails, shared with STAT, she recounts in terse shorthand indignities including 'hooker joke' and 'dirty pic.'  Isaly would embed pornographic images or videos in seemingly innocent emails on an almost daily basis, she said.  Then he'd laugh at her revulsion upon discovering them, she

> said.
>
> h. He would sprinkle his to-do lists for her with dirty jokes and cryptic setups that would expose Burke to something lewd on the internet, she said.  For example, on April 15, 2010, his daily list of tasks included 'look up 'kit kat shuffle,'' Burke said.  She ignored the command, knowing from experience where it would likely lead.  Had she followed Isaly's instructions, she would have found that the phrase is a euphemism for masturbation.
>
> i. For Burke, the final indignity came on Aug. 12, 2010.  She said Isaly called her into his office and asked her to retrieve a file from his briefcase.  When she opened it, she found a flesh-colored vibrator sitting atop his effects, she said.  The next sound was Isaly's booming laughter from across the office, she said.  'The vibrator thing is when I quit,' Burk said.  'It was just, 'You're disgusting. I'm leaving. This is it.''
>
> j. A former investment professional at OrbiMed said Isaly's behavior–and its effects on women in the workplace–were widely known among the firm's leaders.
>
> k. 'People knew that Sam definitely crossed the line,' he said.  'There was a lot of cringing, even at the partner level, but not much got done about it.'  'No ethical person would work there for more than a few years,' Burke said.  'You make your money, and then you leave.'" (Article, at ¶ 9.)

In support of its assertion that Defendant acted in a grossly irresponsible manner by publishing all of the allegations, the SAC asserts that, when interviewing Plaintiff in person,

> Garde observed Plaintiff's physical condition, quadriplegia, that made it improbable, and in some respects impossible, for Plaintiff to have committed most of the acts Burke attributed to him . . . [and] nevertheless did nothing to test Burke's improbable claims that Plaintiff had engaged in the physical movements that were required by Burke's accusations, such as 'embedding' images in electronically sent documents.

(SAC, at ¶ 14.)  Defendant and Garde's "accept[ance] without any further inquiry [of] Burke's purely subjective characterizations of Plaintiff's alleged conduct" is criticized as reckless or grossly irresponsible as well.  (Id. at ¶ 15.)  The SAC further characterizes the decision to publish as "made even more irresponsible by the contrast in how long-term OrbiMed employees who Garde himself interviewed described the severity of Plaintiff's physical disabilities and his thoroughly professional workplace behavior in the 11, 7, and 3 years during which those

employees had worked with Plaintiff." (Id.)[3] Criticizing Defendant and Garde for not having specifically queried Plaintiff during the interview as to whether he had texted Burke on nights and weekends as she had alleged, the SAC asserts that "Plaintiff is unable to use a cellular phone, does not now and has never owned one, and until 2012, did not own or use a device that enabled him to send text messages." (Id. at ¶ 25.) Noting the existence of an earlier article written by Garde concerning spinal cord injuries and treatment, Plaintiff asserts that Garde's failure to follow up on Burke's comments by investigating Plaintiff's physical abilities was indicative of "conscious avoidance of the truth about her allegations or, at a minimum, . . . fail[ure] to act with due consideration for standards of information gathering ordinarily followed by responsible journalists." (Id. at ¶ 27.)

## DISCUSSION

When evaluating a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations within the complaint and draws all reasonable inferences in favor of the Plaintiff. See Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[3] The transcript clearly reflects Plaintiff speaking, eating with a fork (albeit awkwardly), and directing his assistants to aid him in routine tasks such as feeding himself. (See, e.g., Lewis Decl., Ex. 1, at 15.) The transcript also shows that none of the OrbiMed personnel interviewed, other than Plaintiff, denied that the alleged activities happened, none asserted that those activities would have been impossible because of Plaintiff's physical condition, and each denied that they personally had experienced such conduct rather than denying that such conduct ever took place in the office. (See, e.g., id. at 22, 28, 50.) In fact, after the interview, Neild sent Plaintiff a pre-publication email stating that he hoped the article would "be fair and focus on the person responsible, not the entire firm." (Article, at 7.) According to statements made by Plaintiff and the other senior OrbiMed employees during the interview, the company had over one hundred employees, 30% of whom were women who were largely in high turnover administrative positions. (Lewis Decl., Ex. 1, at 6, 10, 28.)

plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A complaint is insufficient where it contains "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id.

Under New York law, a defamation plaintiff must establish five elements: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." Palin v. New York Times Co., 940 F.3d 804, 809 (2d Cir. 2019). Here, Defendant argues that the SAC fails to plead facts sufficient to establish fault. (Defendant's Memorandum of Law in Support of Motion to Dismiss ("Def. Memo."), Docket Entry No. 40, at 1). To establish fault for publications that are "arguably within the sphere of legitimate public concern," a defamation plaintiff who is a private figure must establish "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." Chapadeau v. Utica Observer-Dispatch, 38 N.Y.2d 196, 199 (1975).[4]

Whether a journalist's methods were grossly irresponsible is determined with regard to several factors, including (1) "whether sound journalistic practices were followed in preparing the defamatory article," (2) "whether normal procedures were followed and whether an

---

[4] Plaintiff does not contest that the article comes "within the sphere of legitimate public concern" under Chapadeau. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Opp'n Memo."), Docket No. 53, at 8). Defendant concedes that Plaintiff is a private figure only for purposes of this motion. (Def. Memo, at 1 n.1.).

editor reviewed the copy," (3) "whether there was any reason to doubt the accuracy of the source relied upon so as to produce a duty to make further inquiry to verify the information," and (4) "whether the truth was easily accessible." Dalbec v. Gentleman's Companion, Inc., 828 F.2d 921, 924-925 (2d Cir. 1987) (quoting Hawks v. Record Printing & Pub. Co., 109 A.D.2d 972, 975 (3d Dep't 1985). Here, Plaintiff alleges that the cited statements in the Article are false, and the Court must take that denial at face value on this motion practice. To state a cause of action against the defendant publisher, Plaintiff must allege sufficient facts that, taken as true, are sufficient to support a determination that Defendant was grossly irresponsible in publishing the statements. Cf. Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015) (holding that facts supporting actual malice must be pleaded by a plaintiff who is a limited public figure).

        The Article, which is part of the Complaint, asserts that Garde relied on the first-hand accounts of five former OrbiMed employees, each of whom purported to speak from personal experience about Plaintiff's conduct and the work environment at OrbiMed. (Article, at 2.) Garde further reports that he corroborated the account of one of those sources, Delilah Burke, by examining several of Burke's contemporaneous emails and by speaking with a third-party who confirmed Burke had spoken in the past about some of the incidents described in the Article. (Article, at 6.) Plaintiff also acknowledges that Garde conducted a lengthy pre-publication interview with Plaintiff and three of his colleagues, during which Garde asked about many of the allegations that appeared in the article. (Lewis Decl., Ex. 1, at 15–17.) The Article included Plaintiff's repeated denials of misconduct from that interview. (Article, at 3, 6, 8.) The Article also included statements from two of Plaintiff's colleagues, both of whom denied knowledge of any misconduct. (Id. at 4, 8.) The Article also reports that "[n]one of the five former employees who spoke with STAT alleged that Isaly touched them physically in a sexual

way." (Id. at 3.) Plaintiff does not contend that the use of multiple sources and the disclosure of statements denying the conduct are inconsistent with journalistic standards or otherwise grossly irresponsible.

Plaintiff's principal argument for the sufficiency of his gross irresponsibility allegations is that, due to his quadriplegia, it would have been "physically impossible" for him to take some of the actions attributed to him in the article. (SAC, at ¶ 5; Pl. Opp'n Memo, at 5.)[5] Plaintiff argues that it should have been obvious to Garde during the pre-publication interview that some of Burke's allegations rested on a factual premise that was highly improbable: that Plaintiff could operate electronic devices. (SAC, at ¶ 24.) Plaintiff claims that the implausibility of this premise gave Garde sufficient "reason to doubt the accuracy" of Burke's accusations such that Garde had "a duty to make further inquiry to verify" those allegations before publishing them. Dalbec, 828 F.2d at 925 (quoting Hawks, 109 A.D.2d at 975). According to Plaintiff, Garde's alleged failure to do so is an objective basis from which the Court must infer that Garde's reporting was grossly irresponsible.

Plaintiff's "physical impossibility" argument is, however, both inconsistent with the content of the SAC and the transcript of the interview on which the SAC relies, and insufficient to support plausibly a finding that Garde's failure to ask Plaintiff specifically whether he physically performed each alleged act or failure to perform some other unspecified method of interrogating Burke's allegations constituted gross negligence. First, many of the article's allegedly defamatory statements—for instance that Plaintiff "wantonly demeaned and

---

[5]   Plaintiff claims that he could not have, among other things, "embed[ded] pornographic images" in emails, "sprinkle[d]" his to-do lists for Burke with "dirty jokes," or played pornographic videos on his computer monitor because his condition renders him incapable of operating electronic devices. (SAC, at ¶ 23–24, 26; Pl. Opp'n Memo, at 13–15.)

verbally abused female employees," or that he "routinely sexualized the workplace" at OrbiMed—do not require that Plaintiff took any physical actions at all.  (SAC, at ¶¶ 9(a), (e).)  It is obvious from the transcript of the interview that Plaintiff can speak, and the SAC does not allege otherwise.  Many other parts of the Article, such as one woman's claim that she "glimpsed hardcore pornography playing on the large screens that dominated the trading room floor," likewise make no reference to Plaintiff having performed whatever physical tasks might have been necessary to trigger the display.  (SAC, at ¶ 9(b).)  Instead, Plaintiff's "physical impossibility" argument reaches only a small subset of the statements he alleges are defamatory.  The argument is only relevant to the statements that asserted that Delilah Burke received emails and to-do lists from Plaintiff which contained offensive content (SAC, at ¶¶ 9(g), (h)), that Burke saw a pornographic video playing on Plaintiff's computer monitor when she entered his office (SAC, at ¶ 9(f)), that Burke received phone calls and text messages from Plaintiff on nights and weekends (SAC, at ¶ 25; Article, at 6), that Burke found a "flesh-colored vibrator" in Plaintiff's briefcase when she opened it at his direction (SAC, at ¶ 9(i)), and that Plaintiff palpated breast implants "like stress balls during idle conversation"  (SAC, at ¶ 9(a)).  However, only the last of these statements describes a first-hand account of Plaintiff taking a physical action.  None of the other allegations includes a specific assertion of a physical action by Plaintiff.  Plaintiff alleges in the SAC, and discussed in the interview, his use of personal assistants, including undergraduate interns, to accomplish daily living tasks, including computer and keyboard tasks.  He acknowledges use of a device that enables him to text since 2012 and does not deny access to or use of technology that would have enabled him to engage in communications without help from Burke.  As to the allegation regarding the breast implants, the existence of the implants was acknowledged in the interview, Plaintiff discussed feeling the texture of such implants, and

Garde observed Plaintiff using his hands and arms to manipulate a fork while eating; the SAC's conclusory assertion that touching a breast implant like a stress ball was impossible for Plaintiff is inconsistent with the other specific facts proffered by Plaintiff in the SAC and the transcript and thus need not be taken as true for purposes of evaluating the sufficiency of the complaint. See Iqbal, 556 U.S. at 678 (courts need not assume that "conclusions . . . [or] naked assertions devoid of further factual enhancement" are true).

Plaintiff's failure to plead facts demonstrating that the actions attributed to him were impossible renders implausible his assertion that Plaintiff's physical condition rendered Garde's failure to go beyond reliance on the accounts of five former employees who, in separate conversations, made consistent assertions regarding Plaintiff's behavior and the atmosphere and culture at OrbiMed, contemporaneous email notes corroborating Burke's accounts of improprieties, and a further person who confirmed that Burke had complained of Plaintiff's alleged conduct over the years, grossly irresponsible.  Dalbec, 828 F.2d at 925 (quoting Hawks, 109 A.D.2d at 975).  Accordingly, Plaintiff has not pleaded facts from which the Court may infer that Garde acted in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" when he relied on Burke's account of the events in question.  Chapadeau, 38 N.Y.2d at 199.

Plaintiff also argues that there was reason to doubt all of the article's sources because several of his colleagues defended him and denied knowledge of any misconduct.  (Pl. Opp'n Memo, at 15–17.)  However, none of the statements provided particular reasons to doubt the article's five sources, [6] each of whom purported to speak from personal experience about

---

[6] Two OrbiMed partners claimed that they could not recall any specific complaints related to Plaintiff and sexual harassment during their time at the firm.  (Lewis Decl., Ex. 1, at 21–22.)  A longtime female employee also denied in a general way that sexual

their time at OrbiMed.  General denials of misconduct, standing alone, do not make reliance on several consistent accusations of misconduct "totally unwarranted."  Med-Sales Assocs., Inc., 663 F. Supp. at 913.  Furthermore, not all of Plaintiff's colleagues offered categorical denials during the interview, giving Garde reason to credit the accuracy of his sources' accusations.  The firm's director of human resources, for example, acknowledged receiving some complaints about Plaintiff's behavior, but represented that "nothing has been deemed a sexually egregious behavior." (Lewis Decl., Ex. 1, at 26–27.)  Two of Plaintiff's colleagues acknowledged the presence of the breast implants on Plaintiff's desk and described them as mementos from an investment into their manufacturer.  (Lewis Decl., Ex. 1, at 17.)  And, shortly before the article was published, one of the OrbiMed partners who had defended Plaintiff at the interview emailed STAT to say: "[I]f this article proceeds I hope that you will be fair and focus on the person responsible, not the entire firm."  (Article, at 3.)  None of these statements undermined the apparent reliability of the article's sources.  Accordingly, Plaintiff has not alleged facts from which a fact finder could properly infer that Defendant was grossly irresponsible in its reporting.  New York courts have cautioned that "[a]ccepted standards of journalism require neither exhaustive research nor painstaking judgments."  Med-Sales Assocs., Inc. v. Lebhar-Friedman, Inc., 663 F. Supp. 908, 913 (S.D.N.Y. 1987) (quoting DeLuca v. New York News, 109 Misc. 2d 341, 350 (Sup. Ct. 1981)).

          Plaintiff further argues that this action cannot be resolved on a motion to dismiss because he lacks information necessary to plead gross irresponsibility, information uniquely

---

harassment was a problem at the firm, stating "it's just not any experience I've had or have heard." (Lewis Decl., Ex. 1, at 45.)  Another female OrbiMed employee stated that in her opinion sexual harassment was not a problem at the firm, but she also added that "[t]hat's not to say it never happened. I mean it's just it's been opaque to me."  (Lewis Decl., Ex. 1, at 50.)

within Defendant's possession prior to discovery, including the "state of mind" of Defendant's reporters. (Pl. Opp'n Memo, at 21–25). The Federal Rules of Civil Procedure make it clear, however, that it is Plaintiff's burden to plead, prior to discovery, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Indeed, the Second Circuit has rejected a similar argument from a defamation plaintiff in a case arising under the more stringent actual malice standard. See Biro, 807 F.3d at 545 (affirming dismissal of the complaint for failure to state a claim over plaintiff's objection that it would be "'impossible' without discovery for a plaintiff to plead facts demonstrating that the claim of actual malice is plausible").[7] Multiple district courts have also dismissed defamation complaints for failing to adequately plead gross irresponsibility. See, e.g., Thomas v. City of New York, No. 17-CIV-6079 (AFF) (JO), 2018 WL 5791965 (E.D.N.Y. Nov. 5, 2018). Plaintiff having failed to meet his burden, the motion to dismiss the SAC is granted.

CONCLUSION

For the forgoing reasons, Defendant's motion to dismiss the Second Amended Complaint is granted. The Clerk of Court is requested to enter judgment accordingly and close

---

[7] Plaintiff cites Herbert v. Lando, 441 U.S. 153 (1979), for the proposition that the First Amendment cannot serve as a shield to foreclose inquiry into the issue of fault. (Pl. Opp'n Memo. at 22.) Herbert is inapposite because it addressed the issue of privilege, rather than the sufficiency of a pleading. Herbert, 441 U.S. at 174-75.

this case.

        This Memorandum Opinion and Order resolves Docket Entry Number 39.

    SO ORDERED.

Dated: New York, New York
       September 23, 2020

                                    /s/ Laura Taylor Swain
                              LAURA TAYLOR SWAIN
                              United States District Judge